**UNITED STATES ex rel. LEE KUM HOY et al.**

v.

**SHAUGHNESSY.**

United States District Court,
S. D. New York.
Aug. 31, 1954.

Hong & Gim, New York City, for relators, Benny Gim, New York City, of counsel.

J. Edward Lumbard, U. S. Atty. for the Southern Dist. of New York, New York City, for respondent, Harold R. Tyler, Jr., Asst. U. S. Atty., New York City, Lester Friedman, Atty., Immigration and Naturalization Service, New York City, of counsel.

DIMOCK, District Judge.

This writ of habeas corpus was originally sued out to attack the right of respondent to hold three persons of the Chinese race born in China who had been excluded from the United States. They had contended that they were American citizens by virtue of the citizenship of one Lee Ha whom they claimed as their father. They were then held pursuant to a determination of a Board of Special Inquiry rejecting the claim of paternity. The determination was based largely upon the results of blood tests which were held to preclude the possibility of the claimed paternity.

On a previous hearing I held that relators had been denied opportunities to which they were entitled to attack the blood tests. D.C., 115 F.Supp. 302. I therefore directed that the writ should be sustained unless the hearing before the Board of Special Inquiry be reopened for proceedings which would afford relators those opportunities.

The hearing was reopened and relators were afforded all of the rights to which I had held them to be entitled. They declined to avail themselves of the opportunity to present the results of further blood tests. The Board of Special Inquiry reached the same result as on the earlier hearing and its determination was sustained by the Board of Immigration Appeals. So far as quantum of the evidence is concerned, there was before the Board of Special Inquiry and the Board of Immigration Appeals, if we include the blood test testimony, more than that minimum necessary to render their conclusion safe against attack as reached without due process of law.

On that basis the Government asks an order dismissing the writ. Relators, however, point to two matters left undecided by my previous opinion: first, the point that the mere requirement of a blood test is a denial of due process of law and, second, the claim that blood tests are actually used only in the cases of persons of the Chinese race and that this limitation of the use of the tests constitutes such discrimination as to deny these relators due process of law.

I found it unnecessary when the case was originally before me to decide either of these questions since there was no sufficient evidence that the blood tests here were actually required of these relators and their parents. Additional evidence taken establishes, first, that the tests were administered as if they were a matter of course though the subjects were not advised expressly that the relators would be excluded if they and their parents did not submit, and, second, that none of the subjects made any objection.

Putting the construction on the evidence least favorable to the Government it might be said, first, that relators were told: "Unless you and your alleged parents submit to blood tests your claim of American citizenship will not be ac-

cepted" and, second, that, as a result of this compulsion, relators and the alleged parents submitted to the tests. Relators' position must be that the use of evidence obtained by this means deprived them of their liberty without due process of law. They do not contend that, where authorized by an act of the legislature, the requirement of a blood test violates constitutional rights. See Camden & Suburban Ry. Co. v. Stetson, 177 U.S. 172, 20 S.Ct. 617, 44 L.Ed. 721; Beach v. Beach, 72 App.D.C. 318, 114 F.2d 479, 131 A.L.R. 804; Lue Chow Kon v. Brownell, D.C.S.D.N.Y., 122 F.Supp. 370, decided by Irving R. Kaufman, J. Relators assert that resort to blood tests by the immigration authorities without Congressional sanction deprived them of their constitutional rights.

█ The immigration authorities are charged with the duty of determining the truth of the claims of those who apply for admission to the country as children of citizens. Blood tests, properly taken, can absolutely exclude the possibility of paternity in certain cases. Congress might constitutionally authorize the immigration authorities to require submission to a blood test as a condition to admission. An examining board does not overstep constitutional bounds if it, on its own authority, makes the same requirement. An applicant's refusal to submit to a blood test raises the logical inference that he knows that paternity does not exist and fears that its non-existence may be disclosed by the test.

The cases that emphasize the lack of statutory authority to require physical examination, such as Union Pacific Ry. Co. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734, Camden & Suburban Railway v. Stetson, 177 U.S. 172, 20 S.Ct. 617, supra, Howland v. Beck, 10 Cir., 56 F.2d 35 and Taylor v. Diamond, 241 App.Div. 702, 269 N.Y.S. 799, deal with orders by a court that litigants submit. It is pointed out by the leading case, Union Pacific Ry. Co. v. Botsford, that it is open to a jury to draw such inferences as it may think warranted from the fact that a litigant refuses to submit to a physical examination even where the court has no power to compel submission. As I understand the situation here, the immigration authorities do not assert the power to compel submission to blood tests; they merely reserve to themselves the right to presume, from a refusal to submit to a blood test, that the result would be unfavorable to the refusing party.

It is true that the enforcement of the rule "no blood test, no admission" might be unfair in some cases. It is conceivable that the person alleged by the applicant to be his father might, for reasons of his own, refuse to submit to blood test so that the applicant, though willing to submit himself to the test, would be powerless to meet the condition. Relators, however, make no claim that any such state of facts exists here. Their claim is the bald one that the immigration authorities cannot in any case require submission to a blood test as a condition to admission as a child of an American citizen. I cannot accept that contention.

That brings me to relators' contention that blood tests are required only in the case of persons of the Chinese race and that such discrimination deprives them of due process of law.

To substantiate their claims relators say that blood tests are required in the case of Chinese even where birth certificates are available and are never required in the case of others. On that subject relators' counsel wrote respondent, before the reopened hearing by the Special Inquiry Officer, requesting that an Official of the District Office of the Immigration and Naturalization Service be available to testify with regard to the practices of the Immigration Service and its policies with regard to the blood testing of Chinese persons and submit a statistical report on the following:

(a) how many persons have been given blood tests for the purpose of disproving paternity since May 8, 1952.

(b) how many of these persons have been from the Chinese race and how many from other races.

(c) how many of the Chinese persons tested had birth certificates or other documentary evidence of their identity and how many did not.

(d) of the persons of other than the Chinese race, how many of those given blood tests had birth certificates or other documentary evidence of their identity and how many did not.

On the reopened hearing counsel for relators asked the Special Inquiry Officer whether a person had been produced pursuant to this request. The Special Inquiry Officer replied "I find that it is not necessary to produce an official of the Immigration Service to testify with regard to policy as I feel that it has no bearing on the decision in this case as to whether it is the policy or is not the policy of the Immigration Service to test all Chinese applicants for admission to the United States." This was clear notice to relators that the Special Inquiry Officer would regard as immaterial evidence that persons of other races, though they did not produce birth certificates, were not subjected to blood tests.

Nevertheless the Special Inquiry Officer discussed in his opinion the claim of discrimination. He said "This is predicated upon the fact that it is believed by counsel that as blood typing tests are only conducted on persons of Chinese descent that this is prejudicial. * * * This does not mean by any stretch of the imagination that this same system could not and has not been used in cases of a similar nature. It just so happens that in no other situation has this question arisen."

The Board of Immigration Appeals said in its opinion "It is our belief that the issue of racial discrimination is not proper in this case."

██ Relators were denied due process of law by the Special Inquiry Officer's ruling on the hearing that the Immigration Department's policy had no bearing on the case and by the Board of Immigration Appeals' ruling that the issue of racial discrimination was not proper in the case.

The failure to take evidence on the question of discrimination could be justified only by a holding that under no set of circumstances would requirement of blood tests of Chinese and non-requirement of blood tests of others amount to unconstitutional discrimination. Such a holding could not be supported in law. If the facts established a deliberate use of the blood test technique to exclude Chinese and admit others similarly qualified except for race, the discrimination would clearly be unconstitutional.

Relators contend that blood tests are used only in cases of Chinese applicants and that they are used in all cases of Chinese applicants. The Government seeks to explain any such practice by the fact that China is the only country where records of births and marriages are not kept so that mere force of circumstances requires blood tests only in the cases of Chinese. Relators further contend that the Government is satisfied to accept documents in the case of applicants of other races but that, in the cases of Chinese, blood tests are required even when documents are available. Substance to the latter claim is lent by the cases of Goon Hew Man (V.P. 3 8290, application now pending at the U. S. Consulate in Hong Kong) and Lee Soo Yiu (N.Y. 0300–422307). In the Goon case a contemporaneous birth certificate issued by the British government at Hong Kong was produced, and in the Lee case a contemporaneous birth certificate issued by a large hospital in Canton was produced, and yet in both cases, blood tests were still required.

Relators allege deliberate use of the blood test technique to exclude Chinese and admit others similarly qualified except for race. This result is reached, they say, because the application of the blood tests to Chinese and not to others constitutes more stringent enforcement of the immigration laws against Chinese than against others. Chinese persons, they say, are always subjected to the

rigorous inquisition of a blood test while others, no matter how inconclusive may be the other evidence, are never subjected to a blood test. If such deliberate use of the blood test technique to exclude Chinese exists, the discrimination against Chinese is clear even though the result may be to allow the admission of unqualified non-Chinese rather than to prevent the admission of qualified Chinese. It makes no difference that the complaint of the Chinese is against a failure to go to the full extent of the law in the case of non-Chinese rather than against going beyond the law in the case of Chinese. A minority could be as effectively persecuted by enforcing a law against them alone as by acting against them without warrant of law.

Racial discrimination is abhorrent to our institutions. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774; Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693. The courts, in habeas corpus proceedings, struck down a statutory scheme which prescribed a different rule for determining paternity where a Chinese applicant sought admission as a child of a citizen than where the applicant was of another race. Quan Hing Sun v. White, 9 Cir., 254 F. 402; Jeong Quey How v. White, 9 Cir., 258 F. 618.

Whether or not the requirement of blood tests in the case of Chinese applicants amounts to unconstitutional discrimination can only be determined by an examination of the facts. It may be that something less crude than a deliberate use of the blood test technique to exclude Chinese and to admit others would amount to unconstitutional discrimination but that need not be decided until the facts are ascertained.

The writ will be sustained unless, within 20 days from the date of the order to be entered hereon, the hearing before the Board of Special Inquiry is reopened for the purpose of (a) the introduction of evidence with respect to the requirement of blood grouping tests in the cases of persons of the Chinese race and the omission to require blood grouping tests under similar circumstances in the cases of persons of other races and (b) the determination, upon such evidence, of the issue of discrimination.